United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 1, 2007**

Charles R. Fulbruge III
Clerk

**REVISED August 22, 2007**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 06-10500

---

ALLSTATE INSURANCE COMPANY and STERLING COLLISION CENTERS, INC.,

Plaintiffs-Appellants/Cross-Appellees,

VERSUS

GREG ABBOTT, in his official capacity as Attorney General of
Texas, and SUSAN COMBS, in her official capacity as Texas
Comptroller of Public Accounts,

Defendants-Appellees/Cross-Appellants

VERSUS

AUTOMOTIVE SERVICE ASSOCIATION and CONSUMER CHOICE FOR AUTOBODY
REPAIR,

Intervenors-Appellees/Cross-Appellants

---

Appeal from the United States District Court
For the Northern District of Texas, Dallas Division

---

Before KING, DAVIS, and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Allstate Insurance Co. ("Allstate") and Sterling Collision

Centers, Inc. ("Sterling") brought this action against Greg Abbott

and Susan Combs as Defendants in their official capacities as

-1-

Attorney General of Texas and Texas Comptroller of Public Accounts (collectively "State Defendants")[1] to challenge a Texas statute known as House Bill 1131 (codified as Tex. Occ. Code § 2307.001, et seq.). H.B. 1131 restricts the right of an auto insurer to own and operate auto body shops in Texas. Allstate and Sterling argue the statute violates the dormant Commerce Clause and the First Amendment of the United States Constitution.

After a bench trial, the district court rejected Allstate's dormant Commerce Clause challenge but found that certain provisions of the statute violated the First Amendment. We AFFIRM.

I.   FACTUAL AND PROCEDURAL BACKGROUND

In 2000, Allstate, a Delaware insurance company holding approximately 15% of the automobile insurance market in Texas, implemented a plan to enter the auto body repair business by acquiring Sterling, a multi-state chain of repair shops. Sterling operates approximately 60 auto body repair shops in 14 states, including 15 shops in the state of Texas. Allstate planned to improve existing Sterling facilities and to cultivate new ones. By influencing its customers and other claimants to obtain repair work from Sterling rather than from unaffiliated shops, Allstate

---

[1]Two other parties, Automotive Service Association (a national organization of auto body shops) and Consumer Choice in Auto Body Repair (a group formed contemporaneously with the effort to pass H.B. 1131), intervened and have jointly filed briefs in support of the State Defendants. Because the State Defendants and the Intervenors advance identical positions, we refer to both entities interchangeably as the State Defendants.

believed it could minimize charges for unnecessary or overpriced repairs.

At the time of its acquisition of Sterling, Allstate maintained a relationship with several local body shops in Texas through a program called the Priority Repair Option ("PRO"). Allstate recommended the PRO shops to its insureds and other claimants if the shops maintained a certain level of quality and efficiency. If a customer chose to go to a PRO shop, Allstate provided a guarantee for the repairs performed and became the direct purchaser for the repair services. Allstate found that most PRO shops had a lower average repair cost than other body shops. However, while the PRO program led to some cost savings, Allstate—still troubled by the prevalence of fraud and inefficiencies in repair work (even in PRO shops) and seeking to gain an advantage over competitors that maintained similar programs—decided to explore auto body shop ownership as an additional strategy for cost savings.

After its acquisition of Sterling, Allstate had its telephone service representatives use a script in speaking with policyholders and other claimants. Representatives would first offer the services of the Sterling shops to policyholders, without offering a referral to PRO shops as had been done previously. Allstate followed this approach to boost business at Sterling shops which had lost their pre-existing referral relationships with other insurers after Allstate's acquisition. Under the new practice,

Allstate referred policyholders to PRO shops only when asked.[2]

In addition to using this sales pitch from the script, Allstate sought to boost Sterling's market share by eliminating its PRO relationship with shops that were near a Sterling shop, thus funneling repair opportunities to Sterling.

In 2003, the Texas Legislature began considering H.B. 1131, a bill which would bar insurers from acquiring an interest in auto body shops. The parties dispute the precise motivation for the bill's introduction and passage. Allstate claims that the bill was part of a coordinated political strategy to hurt its venture with Sterling and to maintain the dominance of local Texas body shops. The State Defendants argue that the bill grew out of concerns for customer welfare, particularly that Allstate's dual role as insurer and body shop owner would create a conflict of interest and an

---

[2]The script read as follows:

Mr./Mrs. _____, of course you are always free to choose any repair shop and are under no obligation or requirement to use a shop we recommend, however, I would like to make you aware of the benefits of Sterling Auto Body Centers, which are affiliated with the Allstate Corporation.

Sterling Auto Body Centers are highly respected and provide exceptional customer service. Sterling provides a lifetime guarantee as long as you own your vehicle on both parts and labor. In addition, they will handle all the paper work, keep you updated throughout the repair process, guarantee a completion date, and, even, professionally clean your vehicle inside and out. They can also assist with rental arrangements on site and will pay for additional rental expenses if the guaranteed delivery date is missed.

incentive to short change customers.

Transcripts of the legislative hearings on the bill reflect both consumer protection and local industry concerns. On consumer protection, members in the House and Senate heard testimony from several individuals, many of them affiliated with body shop trade groups, detailing the danger of insurance company ownership of auto body repair shops. These witnesses all warned of the conflict of interest inherent in such an arrangement, arguing that it raised the risk of illegal customer steering. The witnesses also predicted that such arrangements would encourage body shops "tied" to insurers to cut corners in an effort to reduce repair costs.[3] Legislators also heard about the adverse impact on local industry which would result from Allstate's entry into the auto body repair business. For instance, the Vice President of the Automotive Services Association warned that the rise of insurer owned repair shops would lead to the demise of the independent repair industry, along with billions of dollars in local economic impact and hundreds of thousands of jobs. Another bill proponent, a body shop

_____

[3]Both customers and body shop owners testified in support of these concerns. One customer who had been involved in an accident with an Allstate insured told the committee that Allstate discouraged him from taking his car to an independent shop by asserting that the shop kept cars longer than necessary, a claim the witness said was untrue. He further stated that Allstate did not give the shop adequate time to complete repairs. Another witness, a body shop owner, testified that Allstate's management had refused to agree with its own on-site adjuster's assessment that a car was a total loss and instead insisted that the car be repaired.

owner, told the House Committee about how his shop had been forced from Allstate's PRO referral program after a Sterling shop opened down the street.  Several representatives for Allstate also spoke at the hearings.  These individuals attempted to assuage fears about illegal steering and to frame the bill as an obstacle to consumer choice.

It is difficult to say from the legislative history what primary factor motivated passage of the legislation.  We have the not unusual situation where both sides find passages from the legislative history supporting their view of the predominant reason for the legislation.[4]

---

[4]For instance, Representative Flores's explanation of the bill prominently highlighted local industry concerns:

REP. FLORES:  What this seeks is to remedy a situation that is occurring in a lot of the major metropolitan areas, which is – and it's spreading, and it's allowing insurance companies, which are purchasing and building body shops, to compete with those run by our local independent folks back home in our communities.

Hearing on Tex. H.B. 1131 Before the House Comm. on Licensing & Admin. Procedures, 78th Leg., R.S. [hereinafter "H.B. 1131 House Hearing"] 2 (March 6, 2003) (emphasis added).  Similarly, Representative Homer at the same hearing and then Senator Carona in a subsequent Senate hearing commented on the issue of competition with local industry:

REP. HOMER:  Because I'm a small businessman . . ., there's nothing that angers me more than when the big guy comes in and just . . . run[s] you out of town . . . . .  It's kind of the Wal*Mart scenario.

H.B. 1131 House Hearing, pg. 92.

SEN. CARONA:  I think the most significant thing we've tried to do here is . . . just make sure that – in the

H.B. 1131 was passed on May 27, 2003, and took effect on September 1, 2003. As enacted, it accomplished two broad reforms. First, the new law generally prohibits an insurer from owning or acquiring an interest in an auto repair facility.[5] However, facilities already open for business at the time of the bill's passage are exempted.[6] Second, the statute establishes a set of rules to govern these existing shops. Most notably, it requires an insurer to offer the same referral arrangement it has with its tied

---

> shops that the insurance companies actually own . . . we don't let those actual shops owned by the insurance companies have any kind of competitive advantage in a region.

Hearing on Tex. H.B. 1131 Before the Senate Comm. on Bus. & Commerce, 78th Leg., R.S., 11 (May 20, 2003).

> On the other hand, several comments and questions by various members focused on consumer protection:

> REP. WISE: [D]id you say that some employees at Sterling have anonymously told you that their customers are being steered to them by their adjustors?

> REP. DELWIN: [To Allstate lobbyist] I'd like to hear how would you address some of the allegations that you've heard about Allstate adjustors basically forcing people into Sterling . . . .

> REP. DRIVER: But the concept and what the concern is here is how many of those Sterling clients are Allstate clients? How many of them are being directed that way?

H.B. 1131 House Hearing, pg. 14, 41, 73.

[5]Tex. Occ. Code § 2307.002.

[6]Id.

body shop to at least one unaffiliated body shop.[7]  The law does not require that an insurer treat <u>all</u> body shops the same, only that the insurer extend an invitation into a referral program to at least one untied shop and that the insurer treat all tied and untied shops in that referral program the same.

H.B. 1131 carries no criminal penalties.  It instead creates a private cause of action in "any person aggrieved by a violation of the statute."[8]  Based on the seriousness of the violation, a court may impose a civil penalty which is to be sent to the comptroller for deposit in the state's general revenue fund.[9]

Allstate and Sterling are the only entities affected by the law because Sterling is the only body shop in Texas directly owned by an insurer and Allstate is the only insurer in Texas which owns a body shop.

In 2003, Allstate filed the present suit, claiming that H.B. 1131 violates the dormant Commerce Clause and the First Amendment. Allstate argued that because H.B. 1131 forecloses Sterling, an interstate body shop, from opening more body shops in Texas, the purpose and effect of the law is to discriminate against interstate commerce.  The company acknowledged that while the law does not

---

[7]Tex. Occ. Code § 2307.006(11) ("An insurer may not enter into a favored facility agreement exclusively with its tied repair facilities.").

[8]Tex. Occ. Code § 2307.009(a).

[9]Tex. Occ. Code § 2307.009(b).

accomplish this discrimination directly by using statutory classifications based on domicile, the law was adopted for the purpose, and has the effect, of advantaging local industry at the expense of Sterling, a non-resident. Allstate also claimed that the bill's provisions, which make Allstate's ability to promote Sterling shops contingent on Allstate's promotion of other body shops, run afoul of the First Amendment's protection of truthful and non-deceptive commercial speech.

A bench trial was completed in October 2004. At the conclusion of the trial, the district court upheld the bill's restrictions on the acquisition of auto body repair shops. The district court found that the bill was not intended to, nor did it have the effect of, discriminating against interstate commerce. Rather, the district court explained, H.B. 1131 created different treatment of two business forms, independent (or "mom and pop") operations on the one hand versus auto body repair shops owned by insurance companies on the other hand—a permissive basis for discrimination. However, the district court concluded that the bill's speech provisions violated the First Amendment. The court explained that H.B. 1131's provisions were not sufficiently narrow and instead served to deprive consumers of information which may be beneficial. The judge observed that the need for the speech provisions was questionable since Texas consumers already enjoyed the benefit of an anti-steering law, which prohibits insurers from

requiring policyholders to use a certain auto body shop.[10]  The court reasoned that less restrictive means existed to accomplish the consumer welfare aims, for instance, a simple requirement that Allstate disclose its ownership of Sterling.

Allstate appeals the dormant Commerce Clause ruling.  The State Defendants defend that portion of the judgment but find fault with the First Amendment aspect of the trial court's ruling.

## II. JURISDICTION

This case was brought initially in Dallas county state court pursuant to the Texas Declaratory Judgment Act.[11]  On September 23, 2006, the State Defendants timely removed the case to federal district court.  The parties agree that this removal accomplished

---

[10]See Tex. Ins. Code § 5.07-1(b)(2).

[11]Tex. Civ. Prac. & Rem. Code § 37.004(a) ("a person . . . whose rights . . . are affected by a statute . . . may have determined the question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights . . . thereunder.").  Under the TDJA, the Attorney General is a necessary party where the validity of a statute is at issue.  See Tex. Civ. Prac. & Rem. Code § 37.006(b).  Texas courts have recognized that the TDJA waives the state's sovereign immunity. See Tex. Educ. Agency v. Leeper, 893 S.W.2d 432, 446 (Tex.1994) ("[B]y authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorneys fees, the [Declaratory Judgments Act] necessarily waives governmental immunity for such awards."); see also Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 698 (Tex. 2003) (stating that if the Legislature required the State to be joined in a lawsuit for which immunity would otherwise attach, the Legislature intentionally waived the State's sovereign immunity and noting that Leeper stands for the proposition that the TDJA does waive aspects of sovereign immunity).

a waiver of the state's Eleventh Amendment immunity.[12]

The State Defendants argue that the dispute does not satisfy Article III's case or controversy requirement. In order to establish a case or controversy sufficient to give a federal court jurisdiction over their claims, plaintiffs must satisfy three criteria: (1) they must show that they have suffered, or are about to suffer, an "injury in fact"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[13]

While conceding that Allstate has suffered an injury, the State Defendants cite our decision in Okpalobi v. Foster[14] in support of their argument that causation and redressability are lacking in this case. In Okpalobi, we considered whether a district court had properly enjoined the operation and effect of a Louisiana state tort statute which made abortion providers liable to patients in tort for any damage occasioned by abortions. We concluded that because the named defendants (the Governor and the Attorney General) had caused no injury to the plaintiffs and could never themselves cause any injury under the private civil scheme,

---

[12]See Lapides v. Bd. of Regents of Univ. Sys. Of Ga., 535 U.S. 613, 620 (2002).

[13]Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citation omitted).

[14]244 F.3d 405, 426-27 (5th Cir. 2001) (en banc).

-11-

the plaintiffs failed to fulfill Article III's case and controversy requirement.[15]

Okpalobi does not control this case. A case brought against a state officer in his official capacity is essentially a suit against the state.[16] While the states are immune from suit under the Eleventh Amendment, Ex parte Young allows a plaintiff to avoid this bar by naming a state official for the purpose of enjoining the enforcement of an unconstitutional state statute. In turn, Young requires that "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, . . . such officer must have some connection with the enforcement of the act, or else it is merely making . . . the state a party."[17] Because neither the authority of the Louisiana Governor nor Attorney General extended to enforcing the provision challenged by the Okpalobi plaintiffs, the Eleventh Amendment remained a bar to the suit. Our standing analysis was thus limited to an examination of whether causation and

---

[15]Id. at 426.

[16]See, e.g., Diamond v. Charles, 476 U.S. 54, 57 n.2 (1986) (stating that "[a] suit against a state officer in his official capacity is, of course, a suit against the State"); Kentucky v. Graham, 473 U.S. 159, 166 (1985) (noting that suits against state agents are just another way of pleading actions against the state); McCartney v. May, 50 S.W.3d 599, 606 (Tex.App.--Amarillo, 2001, no pet.) ("[a] claim against a state employee in [his] official capacity is, in effect, a claim against the state," and thus, "to that extent, the state is a party.").

[17]Ex parte Young, 209 U.S. 123, 157 (1908) (emphasis added).

-12-

redressability could be linked to the enforcement connection the Governor and Attorney General had with the statute.[18]

Unlike Okpalobi, the state removed this case to federal court and thereby waived its Eleventh Amendment immunity. Therefore, because it is unnecessary to employ the fiction of Young to defeat the state's immunity, the connection between the state officer named in the suit and the enforcement of H.B. 1131 is irrelevant to our standing analysis. Rather, the state is the real party in interest.

Because the state itself is a party, causation and redressability are easily satisfied in this case. Causation is satisfied because the state passed H.B. 1131, a law which threatens Allstate with private civil law suits and civil penalties if it continues with its business plan to acquire additional Sterling body shops. A declaration of unconstitutionality directed against the state would redress Allstate's injury because it would allow Allstate to avoid these penalties and lawsuits.[19] Accordingly, we are satisfied that a genuine case or controversy exists.

### III. COMMERCE CLAUSE CHALLENGE

A district court's judgment concerning a statute's

---

[18]See Okpalobi. at 426-27.

[19]See Franklin v. Massachusetts, 505 U.S. 788, 790-91 (1992) (finding redressability prong satisfied where actors who were not parties to the lawsuit could be expected to amend their conduct in response to a court's declaration).

constitutionality is reviewed de novo.[20] To the extent relevant to the constitutional question, subsidiary facts are reviewed for clear error.[21]

A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect.[22] If the statute impermissibly discriminates, then it is valid only if the state "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest."[23] If the statute does not discriminate, then the statute is valid unless the burden imposed on interstate commerce is "clearly excessive" in relation to the putative local benefits.[24]

## A.

Allstate first attacks H.B. 1131 on the ground that the statute was passed with a discriminatory purpose. The company relies heavily on the legislative statements cited above in asserting that economic protectionism was the predominant motivation for the legislation.

---

[20]Castillo v. Cameron County, 238 F.3d 339, 347 (5th Cir. 2001).

[21]Maine v. Taylor, 477 U.S. 131, 144-45 (1986).

[22]Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270 (1984).

[23]C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 392 (1994).

[24]Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

The burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party challenging the provision.[25]

The Supreme Court has identified the following factors as relevant in determining whether purposeful discrimination animated a state legislature's action: (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.[26]

Considering these factors, we conclude the district court did not clearly err in rejecting Allstate's contention that H.B. 1131 was purposefully discriminatory.

For one, Allstate and Sterling have failed to demonstrate a clear and consistent pattern of discriminatory action by the Texas Legislature. As discussed further below, while the effect of H.B. 1131 is to disadvantage Allstate, this effect derives solely from

_____

[25]See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979).

[26]See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-268 (1977); see also Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 336 (4th Cir. 2001) (applying Arlington Heights factors to dormant Commerce Clause analysis).

-15-

Allstate's status as the only body shop owning insurer in Texas. Allstate has failed to establish a history of hostility towards Allstate singularly or towards out-of-state companies in general.

Further, while characterizing the legislative hearings on H.B. 1131 as "perfunctory," Allstate has failed to show that the Legislature departed from usual procedures in its consideration or enactment of the bill. The Legislature held well attended committee hearings in both of its chambers where proponents for and against the measure were given comparable time to testify. In addition, there is no dispute that key legislators met with Allstate executives on several occasions, allowing the company to express its concerns about the bill. Indeed, these discussions produced a Senate amendment stripping a provision requiring complete divesture of Allstate's ownership interest in Sterling.

Finally, the stray protectionist remarks of certain legislators are insufficient to condemn this statute. Our independent review of the legislative record reveals that the Legislature heard extensive testimony from various witnesses on the legitimate consumer protection concerns sought to be remedied by H.B. 1131. For instance, legislators heard from several witnesses that vertical integration in the insurance business would create an inherent conflict of interest and an irresistible opportunity for insurers to engage in predatory practices.[27] They also heard that

---

[27]H.B. 1131 House Hearing, supra note 4, pg. 5, 7.

a system in which the insurance company and the body shop are aligned would eliminate the traditional checks and balances in the industry, meaning that the insurer's interest in keeping repair costs as low as possible would become the overriding interest.[28] Further, witnesses reported specific instances demonstrating these dangers.[29] This evidence provided a more than adequate and legitimate basis for the Legislature's decision to adopt the proposed regulations and undercuts Allstate's contention that the enactment of the overall statutory scheme was driven by a discriminatory purpose.[30]

Moreover, much of Allstate's evidence of "discrimination" towards out-of-state companies is simply evidence of a legislative desire to treat differently two business forms——independent auto body shops on the one hand and insurance-company-owned auto body shops on the other——a distinction based not on domicile but on business form. In Ford v. Texas Department of Transportation, we recently approved the Texas Legislature's enactment of an analogous statute based on this distinction.[31] In Ford, we upheld, against

---

[28]Id. at 8, 30, 100.

[29]Id. at 17-28, 30-31, 102, 104.

[30]See Maine, 477 U.S. at 150-51 (plaintiff's evidence, including statements made by state administrative agency expressing protectionist motivation for challenged legislation, would not establish violation of dormant Commerce Clause where evidence did not demonstrate that the state had no legitimate interest in enacting the challenged regulation).

[31]264 F.3d 493 (5th Cir. 2001).

-17-

a dormant Commerce Clause challenge, a Texas statute which prohibited automobile manufacturers from acting as automobile dealers.[32] The plaintiff, Ford Motor Company, alleged that the statute violated the dormant Commerce Clause because it isolated Texas's retail car market and prevented the entry of out-of-state firms. Like the present case, the legislative history of the challenged provision in <u>Ford</u> revealed a legislative desire to prevent firms with superior market position (car manufacturers) from entering a downstream market (car dealership), a desire drawn from concern that vertical integration of the automobile market would be detrimental to consumers.[33] We held that because the challenged provision did not discriminate on the basis of a company's business contacts with the state, but rather on the basis of its status as an automobile manufacturer, the statute did not offend the dormant Commerce Clause.[34] We find no significant factual or legal distinction between <u>Ford</u> and the instant case. Like <u>Ford</u>, the Legislature in this case sought to prevent firms with superior market position (insurance companies) from entering a downstream market (auto body repair) upon the belief that such entry would be harmful to consumers. The dormant Commerce Clause

---

[32]<u>Ford</u>, 264 F.3d at 502.

[33]<u>See</u> <u>id.</u> at 500.

[34]<u>Id.</u> at 502 (observing that out-of-state corporations which were non-manufacturers had the same opportunity as in-state corporations to operate in Texas).

is no obstacle to such regulation.

B.

Next, Allstate and Sterling argue that H.B. 1131 has a discriminatory _effect_ because it favors in-state body shops and will cause these services to shift from an out-of-state provider (i.e., Sterling) to in-state providers.  For this proposition, Allstate relies heavily upon Exxon Corp. v. Maryland.[35]  In that case, various oil companies challenged the validity of a Maryland statute prohibiting producers and refiners of petroleum products from operating retail service stations in Maryland.  The producers and refiners argued that the effect of the statute was to protect in-state independent dealers from out-of-state competition.  They contended that the burden of the provision fell solely on interstate companies since Maryland had no in-state producers or refiners.[36]  The Supreme Court rejected the argument and in so doing, explained that merely because "the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."[37] The Court observed that the challenged act "creat[ed] no barriers whatsoever against interstate independent dealers, [did not] prohibit the flow of interstate goods, place added costs upon them,

---

[35]437 U.S. 117 (1978).

[36]Id. at 125.

[37]Id. at 126.

or distinguish between in-state and out-of-state companies in the retail market."[38] The absence of these factors, the Court continued, "distinguishe[d] th[e] case from those in which a State ha[d] been found to have discriminated against interstate commerce."[39] While <u>Exxon</u> illustrates an unsuccessful dormant Commerce Clause challenge, Allstate relies heavily upon a footnote in the opinion in which the Court observed that "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce."[40] Allstate argues that H.B. 1131 results in this precise effect.

Allstate's argument is unpersuasive. As an initial matter, H.B. 1131 does not require Allstate to shut any Sterling stores. Thus it is unclear how the new regulations would affect any shift in the current level of business presently enjoyed by out-of-state suppliers of body shops to in-state shops. However, even if we were to assume that H.B. 1131 would act to reduce Sterling's ability to attract new business, which local body shops would then capture, this would still not establish a Commerce Clause

---

[38]<u>Id.</u>

[39]<u>Id.</u>

[40]<u>Id.</u> at 126, n.16.

-20-

violation.  A state statute impermissibly discriminates only when it discriminates between similarly situated in-state and out-of-state interests.[41]  Under H.B. 1131, as with the provision upheld in Exxon, similarly situated in-state and out-of-state companies are treated identically.  Neither in-state nor out-of-state insurers may acquire a body shop and the statute raises no barriers whatsoever to out-of-state body shops entering the Texas market so long as they are not owned by insurance companies.  Further, H.B. 1131 does not "prohibit the flow of interstate [services], place additional costs upon them, or distinguish between in-state and out-of-state companies in the retail market."[42]  As the Supreme Court concluded under identical circumstances in Exxon, "[t]he absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce."[43]

The record does not support Allstate's bare allegation that business will shift from Sterling to in-state providers.  The district court correctly concluded that Allstate failed to establish a dormant Commerce Clause violation where none of the

_____

[41]Id. at 126.

[42]Id.

[43]Id.; Ford, 264 F.3d 493 (where challenged provision did not "rais[e] the costs of doing business in the local market, strip[] away the economic advantages for an out-of-state participant, or giv[e] advantages to local participants[,]" it did not offend the dormant Commerce Clause).

-21-

hallmarks of past violations were present.  Finally, that no Texas insurer is affected by the new regulation is of no consequence. The Supreme Court rejected the same assertion when offered in Exxon and this court has rejected similar arguments in the past.[44]

C.

The controlling question thus becomes whether, under Pike, "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."[45]  A statute imposes a burden when it inhibits the flow of goods interstate.[46]

Allstate claims that H.B. 1131 inhibits the flow of goods interstate because it deprives Sterling of access to the Texas collision repair services market.

Again, Allstate's argument fails.  The dormant Commerce Clause "protects the interstate market, not particular interstate firms."[47] The Supreme Court has "rejected the 'notion that the Commerce Clause protects the particular structure or methods of operation in

---

[44]Exxon, 437 U.S. at 125; Int'l Truck and Engine Corp. v. Bray, 372 F.3d 717, 726 (5th Cir. 2004) ("That all or most affected businesses are located out-of-state does not tend to prove that a statute is discriminatory."); Ford, 264 F.3d at 502 (finding it of no relevance that Texas had no motor vehicle manufacturers in challenge to law which limited ability of manufacturer's to engage in retail automobile sales).

[45]Pike, 397 U.S. at 142.

[46]Ford, 265 F.3d at 503.

[47]Exxon, 437 U.S. at 127-28.

a . . . market.'"[48]  While H.B. 1131 inhibits Sterling's ability to expand its auto body repair chain in Texas, the law does not prohibit other interstate repair chains or non-resident auto dealers not owned by insurance companies from operating in, or entering, the Texas market.  Evidence was presented at trial showing that several interstate repair shops operate in the state.

Further, even if we were to characterize Sterling's inability to expand as a burden on interstate commerce, that burden would not be clearly excessive as compared to H.B. 1131's putative local benefits.  In assessing a statute's putative local benefits, we cannot "second-guess the empirical judgments of lawmakers concerning the utility of legislation."[49]  Rather, we credit a putative local benefit "so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes."[50]

A reasonable legislator could have believed that H.B. 1131 would further legitimate interests in protecting consumers.  As discussed above, House and Senate committees heard extensive testimony on the dangers of insurer-owned body shops. A legislator could reasonably have believed that a ban on the targeted business

---

[48]CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 93-94 (1987) (quoting Exxon, 437 U.S. at 127)).

[49]CTS, 481 U.S. at 92.

[50]Ford, 264 F.3d at 504 (quoting Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 680-81 (1981)).

-23-

form would further Texas's legitimate interests in consumer protection. That reasonable belief is enough to confirm that H.B. 1131 has at least putative local benefits.[51] Allstate has not established that the burden on one interstate firm constitutes a burden on interstate <u>commerce</u> that clearly outweighs these local benefits.

Because we conclude H.B. 1131 does not violate the dormant Commerce Clause, we need not consider the State Defendant's alternative argument that McCarran-Ferguson Act removes this regulation from the reach of the dormant Commerce Clause.

## IV.   FIRST AMENDMENT CHALLENGE

Alleged violations of free speech present a mixed question of fact and law that is reviewed de novo.[52]

Allstate challenged in the district court the following provisions of H.B. 1131 as violations of the First Amendment's protection of truthful and non-deceptive commercial advertising:

- Tex. Occ. Code § 2306.006(3), which prohibits an insurer from engaging in a joint marketing program with a tied repair facility.

- Tex. Occ. Code § 2306.006(4), which prohibits an insurer from providing to tied repair facilities a recommendation, referral or description not provided on identical terms to other preferred repair facilities.

- Tex.  Occ.  Code  §  2306.006(6),  which  prohibits

---

[51]<u>See</u> <u>Int'l Truck</u>, 372 F.3d at 729.

[52]<u>LLEH, Inc. v. Wichita County, Tex.</u>, 289 F.3d 358, 364-65 (5th Cir. 2002).

-24-

allowing a tied repair facility to use an insurer's name in a manner different from that allowed for any other facility with which the insurer has a referral arrangement.

- Tex. Occ. Code § 2306.006(9), which prohibits an insurer from recommending that policyholders have their vehicles repaired at tied repair facilities, except to the same extent it recommends other repair facilities with whom the insurer has entered into a referral arrangement.

These regulations apply to the existing Sterling stores which are authorized to continue operation in Texas after enactment of H.B. 1131. The district court upheld Allstate's First Amendment challenge.

The First Amendment, as applied to the states through the Fourteenth Amendment, generally protects commercial speech from unwarranted governmental regulation where the speech is not false, deceptive, or misleading.[53] In <u>Central Hudson Gas & Electric Corp., v. Public Service Commission of New York</u>,[54] the Supreme Court articulated a test for determining whether a particular commercial speech regulation is constitutionally permissible. Under that test, a court asks as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, a court next asks whether the asserted governmental interest is

---

[53]<u>Zauderer v. Office of Disciplinary Council</u>, 471 U.S. 626, 628 (1985).

[54]447 U.S. 557 (1980).

substantial. If it is, then a court determines whether the regulation directly advances the governmental interest asserted, and, finally, whether it is not more extensive than is necessary to serve that interest.[55] Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional.[56]

A.

The State Defendants first attempt to defend H.B. 1131's speech provisions under the first prong of the <u>Central Hudson</u> test, i.e., they argue that the prohibited advertisements concern (1) unlawful activity or (2) misleading speech.

### 1. Does H.B. 1131 prohibit advertisements about unlawful activity?

The State Defendants claim that the speech restraints are valid because they are merely incidental to H.B. 1131's provision which requires insurers and their collision repair subsidiaries to negotiate at "arm's length." The State Defendants attempt to analogize this case to <u>Ford</u>, in which we upheld a state law restricting car manufacturers from advertizing cars for sale on their websites. In that case, we explained that because the regulation was only incidental to Texas's general prohibition against manufacturers selling automobiles at retail, it was not

---

[55]<u>Thompson v. Western States Med. Ctr.</u>, 535 U.S. 357, 367 (2002).

[56]<u>Id.</u>

entitled to the protection of the First Amendment.[57]

The instant case is distinguishable from Ford, where the challenged speech regulation sought to prevent a manufacturer from advertising a product it was strictly prohibited by law from selling. Unlike that case, H.B. 1131's speech provisions are not incidental to the regulation of activity made illegal by Texas law. Prohibiting Allstate from giving an exclusive recommendation to a Sterling body repair shop does not help ensure that the two entities are operating at arm's length. Similarly, an arm's length transaction may very well include a negotiated agreement in which an insurer agrees to recommend one body shop exclusively to its customers. Indeed, this is roughly the deal that various auto body shops enrolled in the PRO program have struck with Allstate. Because H.B. 1131 does not make it illegal for Allstate to have a business affiliation with Sterling, there is no legal prohibition preventing Allstate from communicating that relationship to customers.[58]

## 2. Does H.B. 1131 prohibit advertisements which would be misleading?

The State Defendants alternatively seek to uphold H.B. 1131's regulations to prevent false and misleading representations, such

_____

[57]Ford, 264 F.3d at 506.

[58]See id. (noting that if challenged speech regulation prohibited advertising a commercial activity lawful in Texas, the regulation would invoke the protections of the First Amendment and be subjected to Central Hudson).

as the Allstate script's recommendation of Sterling. The State Defendants argue that the implication of the script is that Sterling is the best available auto body repair service in terms of services offered and quality of repair, an implication that is not true. The State Defendants also contend that the Allstate script is misleading because it suggests a link between Allstate and Sterling that would give customers utilizing Sterling pricing or other advantages that are prohibited by Texas law.

The State Defendants' rationale for finding a script which recommends only a tied body shop "false and misleading" is unpersuasive. While it may be that a recommended tied body shop does not enjoy as good a reputation for quality work as other body shops, a recommendation to that shop does not involve an inherently false or misleading representation. This characterization is particularly inapt when applied to Allstate's script, which informs customers of the Allstate/Sterling affiliation at the outset of the pitch, and thus gives customers the option of discounting the recommendation and puffing. Further, the evidence revealed that the majority of Allstate's customers choose <u>not</u> to have their vehicle repaired by Sterling. This is certainly persuasive evidence that an exclusive recommendation does not necessarily mislead consumers into believing that Sterling is far superior to other facilities nor that utilization of the recommended shop is required. Unlike the situation in the principal case relied upon by the State Defendants, <u>Zauderer v. Office of Disciplinary</u>

-28-

Council,[59] the potential for customer confusion here is minimal. We agree with the district court's conclusion that the Allstate script is neither false nor misleading. In light of this conclusion, we turn to the remaining prongs of the Central Hudson test.[60]

B.

Under Central Hudson, after the threshold inquiry, a court must determine whether (1) the state has a substantial interest in regulating the speech; (2) the restriction on speech directly advances the state interest involved; and (3) the state's interest could be equally well served by a more limited restriction on commercial speech.[61]

1. Is there a legitimate state interest?

The State Defendants have successfully asserted a legitimate interest in consumer protection and the promotion of fair competition.[62]

2. Does the regulation directly and materially advance the

---

[59]471 U.S. 626 (1985) (rejecting First Amendment challenge to the application of state rule against deceptive advertising where attorney advertisement was likely to mislead average customer).

[60]See Ford, 264 F.3d at 506 (if a challenged speech provision prohibits advertising a lawful commercial activity, the regulation is subject to intermediate scrutiny outlined in Central Hudson).

[61]Central Hudson, 447 U.S. at 566.

[62]See Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 460 (1978) (state clearly has an interest in consumer protection).

<u>State's asserted interest of benefitting consumers and ensuring fair competition?</u>

As the district court persuasively explained, the State advances no legitimate interest in preventing non-misleading and truthful referrals to a tied body shop:

> Consumers benefit from more, rather than less, information. Attempting to control the outcome of the consumer decisions following such communications by restricting lawful commercial speech is not an appropriate way to advance a state interest in protecting consumers. <u>Thompson v. Western States Med. Ctr.</u>, 535 U.S. 357, 374 (2002)).

H.B. 1131's speech provisions do not require that customers be informed of a insurer/body shop arrangement or the existence of a law against steering, regulations which would arguably reduce the potential for consumer confusion. Rather, the challenged provisions only prevent an insurer from recommending its tied body shop to customers. This would encourage business to shift away from the tied shop but it would not protect consumers, who may or may not choose to use a tied shop even after being informed of its advantages, and who may have a good rather than bad experience if they do choose to use a tied shop.[63] If the work performed on customer vehicles at a tied body shop is shoddy, aggrieved

---

[63] <u>See</u> <u>Central Hudson</u>, 447 U.S. at 562 ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. . . . People will perceive their own best interests if only they are well enough informed, and the best means to that end is to open the channels of communication rather than to close them.") (internal alterations and citation omitted).

customers are free to pursue legal and administrative remedies. Ultimately, the State Defendants have not shown that restricting the truthful speech about the benefits of using a tied auto body repair shop benefits customers.[64]  Notably, Allstate's challenged script gives customers notice of the affiliation between itself and Sterling and further informs them that "[they] are always free to choose any repair shop of [their] choice and are under no obligation or requirement to use a shop [Allstate] recommend[s] . . . ."  These statements offer ample protection against the danger of consumer confusion.

Moreover, on the issue of fair competition, it is not clear how requiring the insurer to recommend at least one other body shop in the PRO program in addition to its tied shop——but not all shops——promotes fair competition.  While this widens the circle of advantaged shops, it does not ensure overall fair competition for all body shops.

## 3.   Is the restriction narrowly tailored to the state interests advanced?

Our analysis of the first three <u>Central Hudson</u> prongs leads us to conclude that H.B. 1131's commercial speech provisions are not narrowly tailored to meet the asserted state objectives.  It is well established that the party seeking to uphold a restriction on

_____

[64]<u>See</u> <u>id.</u> at 567 (suppression of advertising reduces the information available for consumer decisions and is contrary to the purpose of the First Amendment).

commercial speech carries the burden of justifying it.[65] The State Defendants here fail to demonstrate why a more limited restriction, such as a requirement that Allstate disclose its ownership of Sterling or inform customers of Texas's anti-steering law, would not have adequately served the state's interest in consumer protection.[66] Moreover, the State Defendants have not explained how compelling Allstate to provide a referral to at least two body shops would have a positive effect on overall competition or why requirements similar to those we have alluded to above would be any less effective in promoting such ends.

C.

The State Defendants finally contend that while Allstate's script may provide an occasion for a successful as-applied challenge to certain provisions of H.B. 1131, the district court erred in declaring those provisions facially invalid.

We disagree. It is not the content of the specific Allstate script at issue which guides our analysis above, but rather the failure of the State Defendants to suggest a single circumstance in which these provisions, which ban non-misleading and truthful advertising, could be constitutionally applied. The Supreme Court has recently invalidated provisions containing similar blanket bans

---

[65]Thompson, 535 U.S. at 373.

[66]See Central Hudson, 447 U.S. at 571 ("In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of [plaintiff]'s advertising.").

on advertising.[67]

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[67]See Thompson, 535 U.S. at 371-77 (declaring invalid a provision of the Food and Drug Administration Modernization Act of 1997 which prohibited pharmacists from advertising certain types of patient customized drugs where Government failed to demonstrate that the speech restrictions were not more extensive than necessary to serve its asserted interest in public health; "if the Government [can] achieve its interest in a manner that does not restrict speech, or that restricts less speech, the Government must do so."); 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) (striking down state ban on all advertisements containing information about the price of alcohol; state failed to satisfy heavy burden under Central Hudson of justifying a complete ban all ads that contain accurate and non-misleading information); see also Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947 (1984) ("Where . . . a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack.").