**CHURCHILL DOWNS INCORPORATED; Churchill Downs Technology Initiatives Company, doing business as Twinspires.Com, Plaintiffs,**

v.

**Chuck TROUT, in his official capacity as Executive Director of the Texas Racing Commission; Gary P. Aber, Susan Combs, Ronald F. Ederer, Gloria Hicks, Michael F. Martin, Allan Polunsky, Robert Schmidt, John T. Steen III, Vicki Smith Weinberg, in their official capacity as members of the Texas Racing Commission, Defendants.**

Case No. 1:12–CV–00880–JRN.

United States District Court,
W.D. Texas,
Austin Division.

Sept. 23, 2013.

James C. Ho, Prerak Shah, Gibson Dunn & Crutcher LLP, Dallas, TX, for Plaintiffs.

Lesli Gattis Ginn, Assistant Attorney General, Austin, TX, for Defendants.

### ORDER

JAMES R. NOWLIN, District Judge.

Before the Court in the above-entitled and styled cause of action is Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. No. 6); Defendants' Trial Brief (Clerk's Dkt. No. 28); Plaintiffs' Trial Brief (Clerk's Dkt. No. 30); Defendants' Reply Brief (Clerk's Dkt. No. 34); and Plaintiffs' Reply Brief (Clerk's Dkt. No. 35). On May 2, 2013, the Court heard oral argument on the constitutionality of the "in-person" requirement of the Texas Racing Act. The Parties agreed that this dispute was a question of law for the Court. Having considered the Parties' briefs, arguments of counsel, and applicable law, the Court enters the following Order.

### I. FACTUAL BACKGROUND

Plaintiff Churchill Downs, Inc. ("Churchill Downs") is a publicly-traded corporation with its principal place of busi-

ness in Kentucky. Churchill Downs, Inc. owns and operates racetracks throughout the country, the most notable being Churchill Downs Racetrack in Louisville, Kentucky. Churchill Downs does not, however, own or operate any tracks in Texas, nor does it possess any license issued by the Texas Racing Commission.

Plaintiff Churchill Downs Technology Initiatives Company, d/b/a Twinspires.com ("Twinspires.com"), is a Delaware corporation wholly owned by Churchill Downs, Inc. Twinspires.com is an online wagering platform that accepts wagers on races hosted by Churchill Downs, Inc. racetracks and other racetracks—a practice known within the industry as Advance Deposit Wagering ("ADW").

Plaintiffs have simulcast contracts with Texas tracks, allowing them to transmit a telecast of a race from another race track to a Texas track, where the patrons of that track can then wager on the telecast race.

The Commission is a state agency charged with enforcing the statutory and regulatory provisions of the Texas Racing Act. Defendants Chuck Trout, Gary P. Aber, Susan Combs, Ronald F. Ederer, Gloria Hicks, Michael F. Martin, Allan Polunsky, Robert Schmidt, John T. Steen III, and Vicki Smith Weinberg are, respectively, the Executive Director and members of the Commission.

The Texas Racing Act ("Act"), enacted in 1986, regulates wagering on horse racing in Texas and requires all wagering on horse races by Texas residents to be placed in-person. *See* Tex.Rev.Civ. Stat.

art. 179e, §§ 11.01, 11.011, 11.04, 11.05. Under the Act, "[w]agering may be conducted only by an association within its enclosure." Tex.Rev.Civ. Stat. Art. 179e, § 11.01 (Vernon 1986). "Only a person inside the enclosure where a race meeting is authorized may wager on the result of a race presented by the association by contributing money to the pari-mutuel pool operated by the association," *Id.* § 11.04(a). The Act also proscribes betting on Texas horse races over the telephone. *Id.* 11.04(b).

During the 82nd legislative session, the Commission was re-authorized under the state's sunset provision. As part of the legislative process that lead to the Commission's re-authorization, the Legislature added specific language clarifying the legislature's position that the Act prohibits internet and telephonic gambling on horse racing in Texas.[1] Nevertheless, Twinspires.com continued to accept wagers from Texans through its website, and, as a result, the Commission issued a subpoena to Churchill Downs in June of 2012. Pl. App. 7. At a subsequent meeting between Churchill Downs and the Commission, representatives of the Commission informed Plaintiffs that the Commission would begin enforcing what all Parties concede is the State's longstanding policy. Pl. App. 7–8.

Plaintiffs filed this lawsuit for declaratory judgment seeking a declaration that the Texas Racing Act's in-person requirement violates the dormant Commerce Clause of the U.S. Constitution, both facially and as

---

**1.** The 82nd Legislature added Section 17 ("A person may not accept, in-person, by telephone, or over the Internet, a wager for a horse race or greyhound race conducted inside or outside this state from a person in this state unless the wager is authorized under this Act. (§ 11.01(a))"; Section 18 ("Except as provided by this section, a person may not place, in-person, by telephone, or over the Internet, a wager for a horse race or greyhound race conducted inside or outside this state. (§ 11.04(a))"; Section 19 "(A person who is not an association under this Act may not accept from a Texas resident while the resident is in this state a wager on the result of a greyhound race or horse race conducted inside or outside this state. (§ 11.05)."

applied to Plaintiffs, and is therefore unenforceable. Plaintiffs have also asked this Court to issue a permanent injunction prohibiting the Texas Racing Commission ("Commission") from enforcing its in-person requirement, as well as attorneys' fees and costs.

## II. DISCUSSION

■The Commerce Clause grants Congress the authority "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court interpreted a dormant Commerce Clause from this text, finding that since Congress has the power to regulate interstate commerce, states are precluded from doing so by enacting laws or regulations that excessively burden interstate commerce. *E.g.*, *Maine v. Taylor*, 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Through the years, the Supreme Court has laid out a relatively simple framework for evaluating whether a law violates the dormant Commerce Clause. The first question the Court will address is whether the Act "clearly discriminates" against interstate commerce. If the Court determines that the answer to this question is yes, then the Court must strike down the law unless it finds that "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). Such a justification must be sufficient to justify the discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Commission*, 432 U.S.

333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

■ If, however, the Court determines that the Act regulates "evenhandedly" and only "indirectly" burdens interstate commerce, then this Court will uphold the Act unless it determines that the Act burdens interstate commerce in a manner that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

### A. Does the in-person requirement discriminate against interstate commerce?

■ Plaintiffs assert that the Act impermissibly discriminates against Churchill Downs by treating out-of-state gambling websites differently than in state brick-and-mortar gambling establishments. Their argument fails because it incorrectly treats brick-and-mortar gambling as identical to Internet gambling. In fact, they are two wholly different activities.

■ A state law violates the Commerce Clause if it mandates "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005). But, for *Granholm* to apply as Plaintiffs suggest it does, the activities being treated differently must be "substantially similar." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298, 117 S.Ct. 811, 824, 136 L.Ed.2d 761 (1997). Plaintiffs argue that the fact that *Twinspires.com* accepts wagers over the internet rather than at a brick-and-mortar outlet is irrelevant under the Commerce Clause since *Twinspires.com* "offers the same good as its Texas competitors: the opportunity to place 'off-track' wagers on races hosted elsewhere." Pltfs' Reply Brief at 5. According to Plaintiffs, the bettor is "placing

the same wager on the same horse, running the same race with the same odds—and is doing so in the hope of winning the same payout from the same wagering pool." *Id.* at 5–6. This Court disagrees. As the Washington Supreme Court recently observed, "internet gambling and brick-and-mortar gambling are two different activities, presenting risks and concerns of a different nature, and creating different regulatory challenges." *Rousso v. State*, 170 Wash.2d 70, 80, 239 P.3d 1084, 1089 (2010). Gambling in general poses extreme regulatory challenges, but the introduction of internet gambling has amplified all of those challenges considerably. *Id.* Anyone dubious of the meaningful differences between regulating gambling online vs. at brick-and-mortar facilities need only glance at the plethora of regulations the Act imposes upon brick-and-mortar operations that simply cannot be applied to internet operations.[2] To construe two activities that pose such different regulatory challenges as identical for purposes of Commerce Clause analysis would not only be unreasonable—it would dramatically constrain the legislature's ability to tailor legislation to specific problems. For all of these reasons, the Court rejects Plaintiffs' assertions that brick-and-mortar gambling and online gambling are the same activity for purposes of Commerce Clause analysis.

■ Having properly defined the activity in question, the Court now shifts to the task of evaluating whether the in-person requirement impermissibly treats websites

that wish to take bets on horse races based in Texas differentially than the same types of websites based elsewhere in the United States. As previously stated, the dormant Commerce Clause prohibits differential treatment of similarly situated entities on the basis of geography. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87–88, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–72, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Here, the Act makes no such distinctions—the in-person requirement applies to all websites equally, irrespective of geography. Put simply, Texas law makes it illegal for any website based anywhere in Texas or the world to accept wagers on Texas races from Texas residents. Churchill Downs' inability to accept wagers on Texas races flows from its status as an internet gambling website and has nothing to do with the fact that it happens to be run from Kentucky. This is precisely the type of regulation that the dormant Commerce Clause allows, for the Act treats all similarly situated parties equally. *Id.; see also Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir.2007).

**B. Does the in-person requirement have the effect of favoring in-state economic interests over out-of-state interests?**

■ Plaintiffs further contend that the Act's in-person requirement has the effect of favoring Texas based brick-and-mortar operations to the detriment of out-of-state gambling websites. In making this argu-

---

**2.** Applicants collecting wagers must undergo criminal and business background checks. *See* Act § 6.031. The Commission may take licensure action based on a violation of any rule, failure to truthfully answer application questions, excessive alcohol or drug use, and indebtedness to the State. *Id.* § 6.06(a). The Act further provides for the exact commissions to deducted from betting pools. *Id.* § 6.08, *et. seq.* Wagers are not allowed on

credit, automatic banking machines within the enclosure are limited, and minors are prohibited without a parent or guardian. *Id.* §§ 11.03–11.04 and 11.06. Most importantly, the Act is linked to the Texas Penal Code. *Id.* § 6.09; *see also* Tex. Pen.Code Ann. § 47.05 (West 2011). None of these protections and regulatory safeguards applies to Internet wagering.

ment, Plaintiffs again make the mistake of assuming that the dormant Commerce Clause requires the Texas Legislature to treat brick-and-mortar gambling operations in the same way it treats Internet based operations. For reasons described in detail above, the Court rejects this assertion. Instead, proper analysis focuses on whether or not the prohibition of online gambling has the effect of favoring Texas based Internet operations over their out-of-state counterparts. The Court holds that it does not.

■ There are several factors which guide courts in determining whether a neutrally-worded state law has a discriminatory impact: (1) "whether the state 'exclude[s] a class of predominantly out-of-state [residents],'" *Locke v. Shore*, 634 F.3d 1185, 1193 (11th Cir.2011) (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 137, 98 S.Ct. 2207, 2220, 57 L.Ed.2d 91 (1978)); (2) "whether the state statute imposes costs on out-of-state residents that in-state residents do not have to bear," *id.* (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 352–53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1997)); and (3) "whether the state legislature was motivated by protectionist purposes in passing the law at issue," *id.* (citing *Granholm v. Heald*, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) and *H.P. Hood & Sons v. DuMond*, 336 U.S. 525, 538, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949)).

■ Applying this framework to the facts of the present case, the Court finds that Churchill Downs has not introduced any evidence demonstrating that the law imposes costs on out-of-state internet wagering platforms above or beyond those it imposes on Texas based operators. To the extent that Churchill Downs suggests that the impact disproportionately affects out-of-state companies, this argument, too, fails. Not only is the record devoid of any

evidence tending to support such a conclusion, but even such evidence did exist, the Supreme Court has made clear that it is irrelevant if a law, as applied, would affect more out-of-state entities than in-state entities so long as the law imposes the same effect on all similarly situated operations. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987).

**C. Did the Texas Legislature act for protectionist reasons when it passed the in-person requirement?**

■ Finally, Churchill Downs argues that the internet horse racing ban was passed for "purely protectionist motives" and is therefore invalid. "The burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party challenging the provision." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir.2007) (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).

■ In determining whether purposeful discrimination animated a state legislature's action, courts look to "(1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decision-making body; (3) the specific sequence of events leading up the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decision makers." *Id.* (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 336 (4th Cir.2001)).

Considering these factors, the Court concludes that Plaintiffs have not carried their burden of establishing that the ban on betting in horse racing was passed with a discriminatory purpose. First, "Plaintiffs have failed to demonstrate a clear and consistent pattern of discriminatory action." *Id.* at 160–161. While the Act's in-person requirement certainly disadvantages Internet gambling companies (be they out-of-state or in state), this effect derives solely from these organizations status as online companies, which is 100% kosher *Id.* What little evidence Churchill Downs does proffer comes in the form of cherry picked statements from the 2011 debate that preceded the adoption of the clarifying language relating to Internet gambling. These statements simply do not suffice to demonstrate a "history of hostility" towards Churchill Downs specifically or out-of-state Internet companies generally. *Id.* For instance, in their brief, Plaintiffs (selectively) quote Rep. Rafael Anchia's statements from the debate which preceded the re-authorization of the Commission as well as the addition of the language clarifying the scope of the in-person requirement created by the 1986 Act. Pl. Br. 15–16. During that debate, Rep. Anchia explained, "one of the things that's hurting the track and reducing the handle at Texas tracks is internet gaming," where companies "outside Texas" are "accepting wagers in the state over the internet." Tex. H.R. Deb. (April 8, 2011), *transcript available at* http://www.texastribune.org/session/82R/transcripts/2011/4/8/house/.

Notably, Plaintiffs do not quote conversation the followed Rep. Anchia's initial remarks, but it substantially weakens what little impact the preceding quote has on the case at bar. After hearing Rep. Anchia's comments, Rep. James White asked Mr. Anchia "who are the internet guys ... where are they?" *Id.* Mr. Anchia responded by explaining that the internet guys are "all over the place." *Id.* While observing the internet guys are "typically in other states," Mr. Anchia's main bone of contention was that the internet operators "don't have a license in the state of Texas ... yet they're accepting wagers in the state over the internet." *Id.*

In the end, even if this Court were to concede—and it does not—that the exchange between Reps Anchia and White demonstrates that protectionist motives may have played a minor role in motivating a single legislator's vote in favor of the 2011 clarifications to the Act, this fact would still not be sufficient to warrant this Court finding for Plaintiffs since "stray protectionist remarks of certain legislators are insufficient to condemn this statute." *Allstate Ins. Co. v. Abbott,* 495 F.3d 151, 161 (5th Cir.2007).

Churchill Downs also failed to put forth any evidence that tends to show any history of hostility between the Texas Legislature and out of state gambling websites or any evidence that the Texas Legislature departed from the usual procedures when it enacted the Act. Indeed, proving either would be difficult given the long history of the original in-person requirement. When the Legislature first enacted the Act containing the in-person requirement, the Internet—and sites like Twinspires.com—did not exist. While the Plaintiffs submit that the 2011 changes fundamentally altered the meaning of the Act, the reality is that the Legislature did little more than clarify the scope and meaning of the pre-existing in-person requirement. In sum, the only thing that has changed about the original in-person requirement since it was first enacted in 1986 is that the State has actually started enforcing it.

For all of these reasons, the Court rejects Plaintiffs' assertion that the Legislature passed the law in order to advance a

protectionist agenda aimed against out-of-state gambling companies.

## D. Is the burden on interstate commerce "clearly excessive" in relation to a legitimate state interest?

In light of this Court's determination that neither the language nor effect of the in-person requirement is discriminatory, the Court turns now to the final step of its analysis—the so called *Pike* balancing test. Under *Pike*, "the extent of the burden that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The controlling question in this case, thus, is whether, under *Pike*, "the burden imposed on [interstate] commerce is "clearly excessive" in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844. The Court finds that it does not.

The in-person requirement at issue in this case admittedly imposes a meaningful burden on interstate commerce, for it effectively walls off the second largest state in the country from bettors who enjoy or desire to bet on horse races online. Nevertheless, Churchill Downs and other entities like it do have the option of reaching Texas bettors via the simulcast system that Texas law sanctions. Additionally, the *Pike* balancing test calls for this Court to view the burdens in light of the legitimate state interests in regulating a given variety of conduct. *Id.* The evils associated with gambling are well known and not disputed, which is why courts throughout the country have repeatedly affirmed the proposition that the ability to regulate gambling resides squarely in the heart of the state's police power to protect the health, safety, and morals of its citizenry.

*Helton v. Hunt*, 330 F.3d 242 (4th Cir. 2003); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir.2007); *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276 (11th Cir.2005).

When the issue is, as here, the introduction of a new technology into an already difficult to control area like gambling, the state's interest in regulating the conduct becomes even more compelling. As previously noted, every regulatory challenge that gambling has always posed to the state has been made that much more daunting by the advent of the internet. Gambling has always been addictive, but before the internet, at least the addicts had to go to the trouble of driving somewhere to place his bet. The internet allows the addict to get his fix 24/7/365, all without leaving the comfort of his own home. *See Rousso*, 239 P.3d at 1090; *see also Johnson v. Collins Entertainment Co.*, 199 F.3d 710, 720 (4th Cir.1999). Along the same lines, underage patrons looking to get in on the action have always tried to evade detection with fake IDs and the like, but with the advent of the internet, all they need to place a bet is Dad's credit card and date of birth. *Id.* Finally, gambling—especially horse racing—has always attracted crooked individuals hoping to clean their money. *Id.; see also* Ginger Thompson, *A Drug Family Enters the Winners Circle*, June 12, 2012, The New York Times Magazine; available at http://www.nytimes.com/2012/06/13/us/drug-money-from-mexico-makesits-way-to-the-racetrack.html?pagewanted=all&_r=0. With the advent of the internet, though, criminal elements are better able to hide behind the anonymity afforded by the computer screen. *Id.*

The Court could continue to list the challenges posed by online gambling, but this list alone suffices to make the crucial

point, which is that online gambling is a totally new frontier that poses a myriad of extreme regulatory challenges. More importantly, it is not clear that the State has the tools yet to combat these new challenges effectively. The tools the Act applies to brick-and-mortar establishments are certainly not going to get the job done. *Supra note 2.* State regulators cannot physically inspect a website, employees cannot prevent minors from entering a viewing area that is virtual, and state law enforcement officials cannot as effectively ensure that races are not being used for improper purposes when the bettor can hide behind the anonymity offered by the internet.

Of course, simply because this Court believes the State has a meaningful local interest in regulating online gambling does not mean that the State may use a meat cleaver if a scalpel will do. To pass constitutional muster, Texas' in-person requirement must not be "clearly excessive" in relation to the gravity of the State's interest in prohibiting internet wagering. If a reasonable nondiscriminatory alternative exists which could advance the state's interest, then we are obligated to strike down the law. *Pike,* 397 U.S. at 142, 90 S.Ct. 844. In the present case, the Court cannot think of, and Plaintiffs do not cite, any nondiscriminatory alternative that could accomplish the same results that the in-person requirement achieves when applied to brick-and-mortar facilities. The Act's regulation of simulcast wagering at racetracks provides safeguards against certain social harms associated with wagering that the State simply cannot put in place when the venue is a website rather than a physical location. While this Court is sympathetic to Plaintiffs' claims that there are meaningful similarities between betting on the internet and betting at a brick-and-mortar facility, the Supreme Court has made clear that a legislature "need not strike at all evils at the same time or in the same way, and that a legislature may implement [its] program step by step, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981).

There may come a day when more sophisticated means for policing the internet come into being, but until that day comes, this Court will not interfere with the state legislature's decision to treat online betting differently than gambling that takes place at brick-and-mortar establishments.

### III. CONCLUSION

For the reasons above, the Court finds that the Texas in-person requirement does not discriminate against or unduly burden interstate commerce. Defendants have demonstrated to the Court's satisfaction that the in-person requirement comports with the demands of the Constitution and does not transgress the dormant Commerce Clause. Accordingly, the Court enters judgment on behalf of Defendants.

**IT IS HEREBY ORDERED** that judgment is entered for Defendants.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction is hereby **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that all relief not expressly granted is hereby **DE-NIED.**

**IT IS FINALLY ORDERED** that this cause is **DISMISSED WITH PREJU-DICE.**