# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 23, 2025

Lyle W. Cayce
Clerk

No. 24-10245

Healthy Vision Association; National Association of Vision Care Plans, Incorporated; Vision Service Plan Insurance Company; Visionworks of America, Incorporated; Greg Hogan; Bobby Montgomery,

*Plaintiffs—Appellees*,

*versus*

Greg Abbott, *as Governor of the State of Texas*; Ken Paxton, *in his capacity as Attorney General of the State of Texas*; Cassie Brown, *in her capacity as the Insurance Commissioner of the State of Texas*,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:23-CV-167

---

Before Elrod, *Chief Judge*, and Dennis and Higginson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Managed care organizations offer health insurance plans where plan participants see designated health care providers. Texas House Bill 1696 regulates managed vision care plans. The bill is designed to protect vision

care consumers by limiting the information that managed vision care plans can provide to their enrollees.

Businesses and individuals in the vision care industry sued Texas Insurance Commissioner Cassie Brown, Texas Governor Greg Abbott, and Texas Attorney General Ken Paxton in a preenforcement challenge. The plaintiffs alleged that H.B. 1696 imposed an unconstitutional burden on their rights of commercial speech, associational freedom, and equal protection under the First and Fourteenth Amendments to the United States Constitution. The plaintiffs also moved for a preliminary injunction against enforcement of the statute. The defendants moved to dismiss, asserting sovereign immunity. The district court denied the motion to dismiss and granted a preliminary injunction. The defendants appeal the denial of the sovereign immunity defense and the grant of the preliminary injunction.

As things stand at this intermediate stage of the proceedings, we agree with the district court that the claims may proceed against Commissioner Brown, that the plaintiffs are likely to succeed on their commercial speech claims, and that the equities favor a preliminary injunction against the Commissioner. We part ways from the district court with respect to the sovereign immunity of the other defendants. We accordingly affirm the denial of the motion to dismiss as to Commissioner Brown, vacate the denial of the motion to dismiss as to Governor Abbott and Attorney General Paxton, affirm the preliminary injunction insofar as it runs against the Commissioner, vacate the preliminary injunction as against the other defendants, and remand both orders for modification.

## I.

## A.

Plaintiff-Appellee Vision Service Plan Insurance Co. ("VSP") provides managed vision care plans. Plaintiff-Appellee National Association

of Vision Care Plans, Inc. ("NAVCP"), includes such vision care plans as members. Plaintiff-Appellee Healthy Vision Association ("HVA") is a nonprofit organization that provides its members access to resources for vision health, including enrollment in VSP plans. VSP owns optometry retailer Plaintiff-Appellee Visionworks of America, Inc. Plaintiff-Appellee Greg Hogan is an independent optometrist who is a "VSP Premier Edge provider" practicing next to a Visionworks location. Plaintiff-Appellee Bobby Montgomery has VSP insurance and has purchased glasses from a Visionworks store "for the past 15 years." Defendant-Appellant Cassie Brown is the Commissioner of the Texas Department of Insurance. Defendant-Appellant Greg Abbott is the Governor of Texas. Defendant-Appellant Ken Paxton is the Texas Attorney General.

This litigation concerns regulation of managed vision care plans by the State of Texas. A committee of the Texas Legislature determined that managed vision care plans "may differentiate between in-network providers by attempting to steer patients to doctors at locations where" products of businesses owned by the plans "are being sold, and financially control doctors by incentivizing or disincentivizing plan benefits and reimbursements to prefer the products and services they own." H. Ins. Comm., Bill Analysis, H.B. 1696, 88th Leg., Reg. Sess., at 1 (Tex. 2023). To "add transparency for patients" and to "promote local competition and patient choice," *id.*, the Texas Legislature passed H.B. 1696, and the legislation was signed into law on June 14, 2023.

Two provisions of the legislation are at issue in this appeal. The provisions are codified at § 1451.153 of the Texas Insurance Code and read, as relevant here:

(a)    A managed care plan may not: . . .

(4) identify a participating optometrist or therapeutic optometrist differently from another optometrist or therapeutic optometrist based on:

(A) a discount or incentive offered on a medical or vision care product or service . . . by the optometrist or therapeutic optometrist;

(B) the dollar amount, volume amount, or percent usage amount of any product or good purchased by the optometrist or therapeutic optometrist; or

(C) the brand, source, manufacturer, or supplier of a medical or vision care product or service . . . utilized by the optometrist or therapeutic optometrist to practice optometry;

(5) incentivize, recommend, encourage, persuade, or attempt to persuade an enrollee to obtain covered or uncovered products or services:

(A) at any particular participating optometrist or therapeutic optometrist instead of another participating optometrist or therapeutic optometrist;

(B) at a retail establishment owned by, partially owned by, contracted with, or otherwise affiliated with the managed care plan instead of a different participating optometrist or therapeutic optometrist; or

(C) at any Internet or virtual provider or retailer owned by, partially owned by, contracted with, or otherwise affiliated with the managed care plan instead of a different participating optometrist or therapeutic optometrist; . . . .

Tex. Ins. Code § 1451.153.

B.

H.B. 1696 was scheduled to take effect on September 1, 2023.  H.B. 1696, 88th Leg., Reg. Sess. § 12 (Tex. 2023).  In August 2023, VSP, NAVCP, HVA, Visionworks, Hogan, and Montgomery sued Governor Abbott, then-Provisional Attorney General Angela Colmenero, and Commissioner Brown.  The plaintiffs asserted that the provisions of § 1451.153(a)(4)–(5) "restrict what information VSP can communicate to its members about vision care providers in the VSP network, as well as the associations who represent many of those members."  In particular, "VSP cannot tell its enrollees about discounts or rebates offered by any optometrist, including at its own Visionworks stores, because that may 'incentivize' or 'persuade' an insured to obtain care from one optometrist over the other."  The plaintiffs further noted that in the same legislative session, the Texas Legislature prohibited insurers and providers in the general healthcare market from entering into private contracts with "anti-steering" or "anti-tiering" provisions—"the same type of anti-competitive restrictions that H.B. 1696 seeks to impose upon vision care insurance plans."  The plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983 on the basis that H.B. 1696 violated their rights of expression, association, and equal protection under the First and Fourteenth Amendments.

A week after filing the complaint, the plaintiffs moved for a temporary restraining order and preliminary injunction.  Prior to filing the motion, the plaintiffs conferred with the defendants as to whether they would agree to abate enforcement of the statute while the application for preliminary relief was pending, but the defendants stated that they were "not willing to abate any enforcement actions."  On August 30, 2023, the district court denied the motion for a temporary restraining order.  On September 16, 2023, Attorney General Paxton replaced Provisional Attorney General Colmenero as a defendant.

No. 24-10245

The defendants subsequently moved to dismiss under 12(b)(1) and 12(b)(6) of the Federal Rules, raising standing, ripeness, and sovereign immunity arguments in addition to contesting the merits. The first Rule 12 motion was filed on October 16, 2023; the defendants filed a second on February 5, 2024. In their second motion to dismiss, instead of their previous argument that enforcement was speculative because the start date for enforcement was January 1, 2024, the defendants argued that the plaintiffs had not introduced evidence that the statute would be enforced at all.

Discovery ensued over whether H.B. 1696 would in fact be enforced. In emails, counsel for the defendants stated that "Defendants are opposed to the use of affidavits and to any request for live or deposition testimony from the Commissioner," and stated that they would seek to quash any subpoena to the Commissioner on the basis that it was "apex testimony and therefore improper."

Ordering the case to be briefed for summary judgment, the court denied the motion to dismiss and granted the preliminary injunction pending decision of the parties' summary judgment motions. All three defendants appeal the denial of the sovereign immunity defense asserted in the motion to dismiss. The defendants also appeal the preliminary injunction.

## II.

This court has jurisdiction to hear an interlocutory appeal from a district court's denial of sovereign immunity under the collateral order doctrine. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). An interlocutory appeal from a preliminary injunction is proper under 28 U.S.C. § 1292(a)(1).

This court reviews de novo a denial of a motion to dismiss based on sovereign immunity. *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513 (5th Cir. 2017). "A grant of a preliminary

injunction is reviewed for abuse of discretion." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). "Factual determinations within the preliminary injunction analysis are reviewed for clear error, and legal conclusions within the analysis are reviewed de novo." *Id.*

### III.

We start with the denial of the sovereign immunity defense. The immunity that the defendants have asserted derives from the Eleventh Amendment. Under the Eleventh Amendment, "[f]ederal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). But under the rule of *Ex parte Young*, 209 U.S. 123 (1908), "a federal court may enjoin a state official in his official capacity from taking future actions in furtherance of a state law that offends federal law or the federal Constitution." *Moore*, 743 F.3d at 963.

For a suit against a state official to proceed under *Ex parte Young*, "three criteria must be satisfied: (1) A 'plaintiff must name individual state officials as defendants in their official capacities'; (2) the plaintiff must 'allege[] an ongoing violation of federal law'; and (3) the relief sought must be 'properly characterized as prospective.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (citations omitted) (first quoting *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); and then quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). The plaintiffs have asked for declaratory and injunctive relief from the alleged "ongoing . . . conduct" of an "unconstitutional restraint" on their rights, *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015), so the issue is whether the officials they have sued are proper

defendants. *See Book People, Inc. v. Wong*, 91 F.4th 318, 334–35 (5th Cir. 2024).

"To be a proper defendant under *Ex parte Young*, a state official 'must have some connection with the enforcement of' the law being challenged." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quoting *Ex parte Young*, 209 U.S. at 157). "'[O]ur decisions are not a model of clarity on what constitutes a sufficient connection to enforcement.' Still, there are 'guideposts' to aid the decision." *Id.* (citation omitted) (first quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 n.21 (5th Cir. 2020) [hereinafter *Texas Democratic Party I*]; and then quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022)). "[T]he state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.' Rather, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Book People*, 91 F.4th at 335 (footnote omitted) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999–1000 (5th Cir. 2019)).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) [hereinafter *Texas Democratic Party II*]). "[D]irect enforcement . . . is not required." *Air Evac EMS*, 851 F.3d at 519.

## A.

Commissioner Brown has "the particular duty to enforce the statute in question." *Book People*, 91 F.4th at 335 (quoting *City of Austin*, 943 F.3d at 1000). A section titled "Enforcement of Subchapter" specifies that "[t]he commissioner shall take all reasonable actions to ensure compliance with this subchapter, including issuing orders to enforce this subchapter." Tex. Ins. Code § 1451.158(b). Violations are "subject to an administrative penalty

under Chapter 84" of the Insurance Code. *Id.* § 1451.158(a). Such penalties are imposed by the Commissioner. *Id.* §§ 84.021, 84.044.

The defendants nonetheless contend that Commissioner Brown is immune from suit. They argue that "the Commissioner is vested with discretion regarding how to enforce the challenged statutes." They cite § 1451.158(b), emphasizing that "[t]he commissioner shall take all *reasonable* actions to ensure compliance with this subchapter."

The argument is not well-founded. The defendants are correct that "[d]iscretionary authority to act, *on its own*, is insufficient to give rise to . . . a 'sufficient connection [to] enforcement.'" *Mi Familia Vota*, 105 F.4th at 327 (emphasis added) (quoting *City of Austin*, 943 F.3d at 998). Standing alone, a state official's discretion is not itself "individual conduct" on account of which the official may be "stripped of his official or representative character," *Ex parte Young*, 209 U.S. at 160, particularly for example when coupled with a statute's moribundity or persuasive representations of its nonenforcement. *See, e.g.*, *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024). But this does not foreclose a plaintiff from using the extension of authority to an official to enforce a statute to "connect[]" an official's discretion to actual enforcement by indicating some reasonable prospect of how that discretion is to be exercised. *See, e.g.*, *Ex parte Young*, 209 U.S. at 158 (rejecting a related argument "that as the statute does not specifically make it the duty of the attorney general . . . to enforce it, he has, under such circumstances, a full general discretion whether to attempt its enforcement or not"); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 45–46 (2021) (opinion of Gorsuch, J.) ("Each of these individuals is an executive licensing official who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code."); *id.* at 59–60 (Roberts, C.J., concurring in part in the judgment and dissenting in part) ("As eight Members of the Court agree, petitioners may

bring a pre-enforcement suit challenging the Texas law in federal court . . . because there exist state executive officials who retain authority to enforce it." (citation omitted)); *Book People*, 91 F.4th at 332, 335 (finding a sufficient connection to enforcement in the Texas Education Commissioner's discretionary review of library vendors' ratings).

Moreover, the defendants put the emphasis in the wrong place with their proposed interpretation. The emphasis should be on "*shall*," which indicates that however much discretion the Commissioner may have as to the details, enforcement of the statute is mandatory. *See Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019) ("The term 'shall,' as the Legislature has explained in the Code Construction Act, 'imposes a duty.'" (quoting Tex. Gov't Code § 311.016(2))). The statutory scheme of "reasonable actions," "all" of which the Commissioner is obligated to undertake, Tex. Ins. Code § 1451.158(b), includes not only orders but penalties that the plaintiffs have plausibly alleged to constrain their provision of vision care services, *see id.* § 1451.158(a). The threat of onerous penalties is an ongoing "compulsion or constraint," and where such compulsion or constraint amounts to a violation of the Constitution or the federal laws, those responsible may be properly restrained from commission of the wrong. *Tex. Democratic Party II*, 978 F.3d at 179–80 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)); *see also Ex parte Young*, 209 U.S. at 146–48 (citing *Cotting v. Godard*, 183 U.S. 79, 102 (1901)); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 273–74 (1997) (opinion of Kennedy, J.); *Air Evac EMS*, 851 F.3d at 519–20; *Denton v. City of Carrollton*, 235 F.2d 481, 485 (5th Cir. 1956). "In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do." *Ex parte Young*, 209 U.S. at 159.

Relying on similarly flawed premises, the defendants further argue that Brown "has not threatened any Plaintiff with an enforcement action."

In our recent cases, we have assessed whether the threat of enforcement is sufficiently concrete to make an official a proper defendant by applying the "guidepost" of "whether the official has a 'demonstrated willingness' to enforce the challenged statute." *Mi Familia Vota*, 105 F.4th at 329 (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). This guidepost was initially articulated in *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc) (opinion of Jolly, J.),[1] and was restated in *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). We have since elaborated that "'the state officials must have taken some step to enforce' the statute. In deciding how big the step must be, 'the bare minimum appears to be "some scintilla" of affirmative action by the state official.'" *Mi Familia Vota*, 105 F.4th at 329 (citation omitted) (quoting *Tex. Democratic Party I*, 961 F.3d at 401).

This guidepost must not be understood so rigidly as to thwart its orienting purpose. Because *Ex parte Young* concerns prospective relief, the enforcement action targeted by such relief ordinarily is ongoing or takes place in the future. *See, e.g.*, *NiGen*, 804 F.3d at 395 (noting "threatening letters" from the Texas Attorney General). At the same time, an inference of future enforcement may be made from historical data. *See, e.g.*, *Air Evac EMS*, 851 F.3d at 519 (citing "state defendants' pervasive enforcement"). While the term "demonstrated" points toward the past, and "willingness" points toward the future, we have not imposed upon plaintiffs the insuperable obstacle of proving the future as if it has already been observed; we have merely asked them for an evidence-based forecast. *See Mi Familia Vota*, 105 F.4th at 329. Of necessity in such a situation, circumstantial evidence will do. A plaintiff thus has only to provide "some scintilla" of an indication that a defendant official is willing to enforce the challenged statute in order that

---

[1] We have generally declined to afford precedential weight to the *Okpalobi* plurality opinion. *See City of Austin*, 943 F.3d at 999–1000.

such ultra vires action may be reasonably anticipated and restrained. *Id.* (quoting *Tex. Democratic Party I*, 961 F.3d at 401).

We have previously discerned this scintilla of enforcement in view of the constraining effect of an official's statutory duties. In *Texas Democratic Party II*, the Texas Secretary of State had the "specific and relevant duty to design the application form for mail-in ballots and to provide that form to local authorities and others who request it." 978 F.3d at 179 (citation omitted). Since "local authorities" were generally "required to use the Secretary's absentee-ballot form," we determined the Secretary to have "the authority to compel or constrain local officials based on actions she takes as to the application form." *Id.* at 180.

Similarly, here "'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty'" are shown by the Commissioner's "specific and relevant duty" to enforce H.B. 1696 and its accompaniment in the Texas Insurance Code by "the authority to compel or constrain" providers of managed care plans to adhere to their own mandatory duties under the statute. *Tex. Democratic Party II*, 978 F.3d at 179–80 (first quoting *Morris*, 739 F.3d at 746; and then citing *City of Austin*, 943 F.3d at 1000). And if constraint in law were not enough—which would strain against our usual assumption that officials discharge their duties, *see, e.g.*, *Phila. & Trenton R.R. Co. v. Stimpson*, 39 U.S. (14 Pet.) 448, 458 (1840) (Story, J.)— the plaintiffs further plausibly allege that they are in fact "comp[e]l[led]" and "constrain[ed]" by this state of affairs. *See K.P.*, 627 F.3d at 124. This conscription of regulated parties into conforming to the statute because of their reasonable anticipation of its enforcement by the Commissioner makes out a scintilla of affirmative action.

The parties' discussion of burden further supports this conclusion. The plaintiffs, citing *Virginia v. American Booksellers Ass'n*, 484 U.S. 383,

392–93 (1988), press that "[i]n a First Amendment case such as this, Appellants . . . have the burden of proving that they do not intend to enforce the statute because the mere existence of a statute punishing speech carries the obvious risk to speech, including but not limited to self-censorship" (emphasis omitted).  The defendants cite *National Press Photographers Ass'n* for the proposition that a First Amendment plaintiff's entitlement to a presumption of future enforcement for standing purposes does not translate into a presumption that an official has shown "willingness to exercise their enforcement duties" for *Ex parte Young* purposes.  *See* 90 F.4th at 786.

Neither side has it quite right.  "[T]he 'Article III standing analysis and *Ex parte Young* analysis "significantly overlap,"' such that 'a finding of standing tends toward a finding' that a plaintiff may sue the official under the *Ex parte Young* exception."  *Book People*, 91 F.4th at 335 (footnote omitted) (quoting *City of Austin*, 943 F.3d at 1002).  The "inquiries, however, are not completely coterminous."  *Nat'l Press Photographers Ass'n*, 90 F.4th at 786.  "[T]he 'general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought,' not who is bringing the lawsuit."  *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011) (citation omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984)).  So, while the elements of standing all relate, in extrapolating from fear-based standing to the *Ex parte Young* proper defendant inquiry, the focus is on traceability or redressability rather than injury, on connecting the creditable threat of prosecution to the *particular officials* who would be subject to a decree.  *Mi Familia Vota*, 105 F.4th at 329 n.11.

The indicia of a credible threat of enforcement against a plaintiff, accordingly, are often useful for finding the jurisdictional facts concerning a defendant that are relevant to the sovereign immunity analysis.  In *Book People*, when we considered whether the Commissioner of the Texas Education Agency had "the particular duty to enforce the statute in question

and a demonstrated willingness to exercise that duty," after referencing our standing analysis we considered the statutory authority of the Commissioner and its effect on the plaintiffs' "compel[led]" and "constrain[ed]" speech. 91 F.4th at 335 & n.99 (quoting *City of Austin*, 943 F.3d at 1000). And in explaining that the Commissioner could enforce the challenged laws through the school districts, we again cross-referenced our standing analysis, *id.* at 336 n.100, where we had presumed a "credible threat" of such indirect enforcement based on the Commissioner's statutory authority "because the State has provided no 'compelling contrary evidence,'" *id.* at 330 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)).

Applying *Book People* to this case buttresses our conclusion that the Commissioner is properly subject to suit. As discussed, the Commissioner has a statutory duty to enforce the law. The plaintiffs note that "the Appellants refused to voluntarily stay enforcement of the law pending this appeal. And when Appellants below argued no official would enforce the law, they refused to make the Commissioner available for a deposition" (citation omitted). The plaintiffs further point out that the defendants have not introduced evidence that the Commissioner "may simply choose not to enforce the law," nor "an affidavit or declaration from the Commissioner stating her intent *not* to enforce H.B. 1696." As a result, the plaintiffs contend, they have self-censored, identifying in their First Amendment contentions specific expression that has been forbidden.

These actions link the Commissioner to the reasonably anticipated enforcement that the plaintiffs have asked the district court to restrain. It is reasonable not only to anticipate that the legislation will be enforced in

general, but that it will be enforced by the Commissioner in particular.[2]  That makes the Commissioner a proper *Ex parte Young* defendant.

Moreover, the plaintiffs argue that "an enforcement letter" was "directed by the Commissioner's Department of Insurance to VSP."  That letter asks VSP to respond to a complaint from an optometrist who says "VSP chooses to make it hard for [doctors] to get out of network information," urging the Department to "Follow the Law 1696."  This too is at least a "scintilla" of affirmative action, particularly absent any contention that the Commissioner intends to put a stop to the enforcement process.

The defendants make a few additional objections.  First, they say only VSP is regulated by the challenged legislation, arguing on this basis that the other plaintiffs lack standing.  But we have already noted that the plaintiff's identity is not our focus under *Ex parte Young*, *Stewart*, 563 U.S. at 256, and as for standing "[i]t is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit," *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

---

[2] That distinguishes this case from *Mi Familia Vota*, where we determined that there was no reasonable prospect of enforcement.  In that case, the plaintiffs brought suit against the Harris County District Attorney based only on her generic duty to bring prosecutions on the State's behalf—despite the fact that she had complete discretion to prosecute violations of the challenged provisions, and even stipulated that she would not do so during the pendency of the challenge. 105 F.4th at 326–28, 330–31, 331 n.13. Because enforcement was so speculative, the plaintiffs' "fear of prosecution" did not "demonstrate compulsion or constraint." *Id.* at 332. Here, however, we have the comprehensive refusal of an officer with mandatory statutory duties to repudiate those obligations, leading to a credible rather than speculative fear of enforcement. *See Mi Familia Vota*, 105 F.4th at 333 ("[A] 'case-by-case approach to the *Young* doctrine has been evident from the start.'" (quoting *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 280 (opinion of Kennedy, J.))).

No. 24-10245

Second, the defendants state that "VSP has not identified a post-January 1, 2024, contract or plan that would even be subject to the new requirements," citing § 11 of H.B. 1696, which applies the legislation to plans entered into or renewed after January 1, 2024. The argument seems to be that there is no evidence that VSP has issued any plans in Texas after January 1, 2024, despite having asserted that it has a number of members in Texas. Even if that argument were facially plausible, it would rest on less-than-solid analytical footing, since VSP has asked for *prospective* relief to remedy the chilled exercise of its rights. And in any case, *Ex parte Young* calls for a "straightforward inquiry" rather than a searching inquisition, *Verizon Md.*, 535 U.S. at 645 (quoting *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment))—particularly in a Rule 12 posture.

We conclude that the case may proceed against Commissioner Brown.

B.

Although the statute delegates enforcement to the Commissioner, this does not necessarily end the inquiry. An officer's enforcement duties need not be expressly "declared in the same act which is to be enforced." *Ex parte Young*, 209 U.S. at 157. That cautions against overreading our statement that "[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends," *City of Austin*, 943 F.3d at 998, even if sometimes the structure of an enforcement scheme "refute[s] any notion" that a statute is enforced by the defendant official, *see, e.g.*, *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022). In this case, alternative theories of enforcement have been introduced notwithstanding the Commissioner's statutory duties, so we consider whether Governor Abbott and Attorney General Paxton are proper defendants.

16

No. 24-10245

The plaintiffs contend that Governor Abbott is properly subject to suit because of his constitutional obligation to "cause the laws to be faithfully executed." *See* Tex. Const. art. IV, § 10. That is a "general duty to see that the laws of the state are implemented." *Book People*, 91 F.4th at 335 (quoting *City of Austin*, 943 F.3d at 999–1000). In substance, our circuit has said, that basis for suit amounts to "attempting to make the state a party." *Air Evac EMS*, 851 F.3d at 517 (quoting *Ex parte Young*, 209 U.S. at 157). Accordingly, such general duties do not make the Governor subject to suit under *Ex parte Young*. *See Tex. Democratic Party I*, 961 F.3d at 400–01; *Morris*, 739 F.3d at 746.

The plaintiffs raise similarly insufficient general qualities on the part of Attorney General Paxton.[3] *See* Tex. Gov't Code § 402.010. Although a state attorney general is not immune from suit simply because of the general nature of his office, *see Ex parte Young*, 209 U.S. at 159–60, we have rejected the proposition that a state attorney general can be sued under *Ex parte Young* based on pure speculation about intervention to defend a statute's constitutionality in a future suit. *City of Austin*, 943 F.3d at 1002.

Since the plaintiffs have not shown on appeal that either Governor Abbott or Attorney General Paxton are proper *Ex parte Young* defendants, we conclude that the district court should have dismissed them from the suit.

IV.

We now turn to the district court's preliminary injunction. To obtain a preliminary injunction, a plaintiff must show:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer

---

[3] The plaintiffs do not raise Attorney General Paxton's potential representation of the Commissioner in appeals from administrative actions. *See* Tex. Ins. Code § 84.048.

irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

The district court found that each of these factors weighed in favor of a preliminary injunction. We address the likelihood of success on the merits as to the commercial speech, associational freedom, and equal protection claims, and then turn to the balance of the equities.

### A.

The district court found that the plaintiffs were likely to succeed "on the merits of their underlying substantive claims," which included commercial speech claims. The district court enjoined enforcement of the statute as a general matter, and the plaintiffs continue to advance both facial and as-applied commercial speech challenges. We first assess whether the commercial speech claim is likely to succeed on the merits, and then consider the propriety of facial relief.

### i.

"The First Amendment, as applied to the states through the Fourteenth Amendment, generally protects commercial speech from unwarranted governmental regulation where the speech is not false, deceptive, or misleading." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 165 (5th Cir. 2007). The *Central Hudson* test governs whether a regulation of commercial speech is constitutional:

> [W]e ask as a threshold matter whether the commercial speech concerns unlawful activity or is misleading. If so, then the speech is not protected by the First Amendment. If the speech concerns lawful activity and is not misleading, however, we

next ask "whether the asserted governmental interest is substantial." If it is, then we "determine whether the regulation directly advances the governmental interest asserted," and, finally, "whether it is not more extensive than is necessary to serve that interest." Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional.

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) (citations omitted) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

The statute here applies to truthful and nonmisleading speech concerning lawful activity. The plaintiffs assert that "H.B. 1696 prohibits VSP from telling its members in Texas which optometrists within its network sell what vision care products, and similarly forbids VSP from informing its members which retailers are Premier Edge locations that may offer discounts and savings to members." The defendants respond that such an "interpretation hardly is compelled by the text."

In fact, however, the statutory text does compel this interpretation. "A managed care plan may not . . . identify a participating optometrist . . . differently from another optometrist . . . based on . . . the brand, source, manufacturer, or supplier of a . . . vision care product . . . utilized by the optometrist . . . ." Tex. Ins. Code § 1451.153(a). The defendants have not attempted to elaborate any special interpretation of "utilized," and it does not seem possible for VSP to "tell[] its members in Texas which optometrists within its network sell what vision care products" without identifying optometrists on the basis of what vision care products they stock. Similarly, "[a] managed care plan may not . . . incentivize, recommend, encourage, persuade, or attempt to persuade an enrollee to obtain covered or uncovered products or services . . . at a retail establishment . . . affiliated with

the managed care plan instead of a different participating optometrist or therapeutic optometrist . . . ."  *Id.*  Again, it is hard to see how VSP can "inform[] its members which retailers are Premier Edge locations that may offer discounts and savings" without giving members an incentive (discounts and savings) to obtain products at those retailers.[4]

That makes this case similar to *Allstate*.  There, the Texas Occupational Code "prohibit[ed] an insurer from recommending that policyholders have their vehicles repaired at tied repair facilities, except to the same extent it recommends other repair facilities with whom the insurer has entered into a referral arrangement," among other challenged regulations.  495 F.3d at 165.  We noted that the underlying business affiliation was not itself illegal and that recommendation of tied rather than other body shops "d[id] not involve an inherently false or misleading representation."  *Id.* at 166.

After finding that the State had "asserted a legitimate interest in consumer protection and the promotion of fair competition," *id.* at 167, we considered whether the challenged statute advanced this interest.  The analysis is worth quoting at length:[5]

> As the district court persuasively explained, the State advances no legitimate interest in preventing non-misleading and truthful referrals to a tied body shop:

---

[4] The defendants have not argued any nonexpressive scope for the term "incentivize," so we are not in a position to consider whether some expressive applications of this term might be justified under *Central Hudson* as regulations of activity that the statute additionally makes illegal.  *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388–89 (1973).

[5] The passage states that "the State advances no legitimate interest," but the decision makes clear that the identified interests, although legitimate, were not advanced.  *Allstate*, 495 F.3d at 167.

No. 24-10245

> Consumers benefit from more, rather than less, information. Attempting to control the outcome of the consumer decisions following such communications by restricting lawful commercial speech is not an appropriate way to advance a state interest in protecting consumers.

> H.B. 1131's speech provisions do not require that customers be informed of a insurer/body shop arrangement or the existence of a law against steering, regulations which would arguably reduce the potential for consumer confusion. Rather, the challenged provisions only prevent an insurer from recommending its tied body shop to customers. This . . . would not protect consumers, who may or may not choose to use a tied shop even after being informed of its advantages . . . . Ultimately, the State Defendants have not shown that restricting the truthful speech about the benefits of using a tied auto body repair shop benefits customers.

495 F.3d at 167 (citation omitted).

Here too, the asserted interests of transparency, fair competition, and patient choice are legitimate (and likely substantial) ones, *see id.* & n.62,[6] but

---

[6] The plaintiffs say that Texas's "true motive" was different. They argue that "the State's only stated 'interest' is protectionism," which they assert can never be a legitimate interest. The plaintiffs are correct that in a *Central Hudson* analysis, although we do not aid the government's case by "supplant[ing] the precise interests put forward by the State with other suppositions," we will look behind recited purposes to discern invidious ones. *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993). But a state may "protect" businesses "from competition in other ways" that do not trammel on the free flow of information. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 769–70 (1976). While we have said that "naked transfer of wealth" is not a legislative end, *St. Joseph Abbey v. Castille*, 700 F.3d 154, 161 (5th Cir. 2012), not every workaday regulation of economic activity works an arbitrary expropriation. *See generally Chi. B. & Q.R.R. Co. v. McGuire*, 219 U.S. 549, 567 (1911). Even if protection of smaller-scale optometrists is the object of H.B. 1696, the defendants have connected such protection to legitimate public goals such as fairness in Texas's marketplace.

such interests are not properly advanced by requiring "that consumers should be misled or uninformed for their own protection." *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 497 (1995) (Stevens, J., concurring in the judgment). "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011) (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (opinion of Stevens, J.)).

*Allstate* especially forecloses us from concluding that the government may protect patients by leaving them in the dark about "which optometrists within [VSP's] network sell what vision care products" or which retailers "offer discounts and savings." Were this our initial point of departure upon this course we might set off with some care, wary as we must be of the hazards of Lochnerianism—but our precedent squarely compels the determination that Texas's regulatory approach frustrates the asserted state interests of transparency and patient choice.

Nor may we conclude that the approach taken by H.B. 1696 is an acceptable way to further competition. "[Texas] is free to require whatever professional standards it wishes of its [optometrists]; it may subsidize them or protect them from competition in other ways. But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing [optometrists] are offering." *Va. State Bd. of Pharmacy*, 425 U.S. at 770 (citation omitted).

Moreover, the statute is not sufficiently tailored to the State's interests. As in *Allstate*, Texas could have attempted to serve its interest in pricing transparency and consumer choice by ensuring patient reception of *additional* information. The defendants have not explained why it would not further the asserted state interests, for example, to impose disclosure

requirements on VSP concerning its interest in Visionworks or affiliation with Premier Edge practitioners. *See Allstate*, 495 F.3d at 168.

Because the defendants have not explained why H.B. 1696's limitations on speech directly advance the governmental interests they have asserted in a manner no more extensive than necessary, we conclude that the plaintiffs are likely to succeed on their commercial speech claim.

ii.

This leads us to the next issue, which is whether facial invalidation is likely to be proper. A plaintiff bringing a facial challenge "bears the heavy burden of showing that either '"no set of circumstances exists under which [the Act] would be valid," or that the statute lacks any "plainly legitimate sweep . . . .'"" *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 220 (5th Cir. 2023) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). "[W]hen considering a facial challenge it is necessary to proceed with caution and restraint . . . ." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). And "the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977).

The first question is whether there is a narrowing construction. If a statute is "'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Am. Booksellers Ass'n*, 484 U.S. at 397. But this court "will not rewrite a state law to conform it to constitutional requirements." *Id.* The court is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)).

The defendants urge this court to construe the challenged provisions "to prohibit only managed care plans' inherently deceptive

communications."[7]  "For example, to the extent VSP communicates that its plans or preferred providers offer the 'best' or 'most affordable' products and services, such statements could be actually or inherently deceptive depending on the context and circumstances . . ." (citation omitted).

This proposal is not consistent with the statutory text.  The proscribed acts of "identify[ing]" optometrists and "incentiviz[ing], recommend[ing], encourag[ing], persuad[ing], or attempt[ing] to persuade an enrollee to obtain . . . products or services" are not restricted to deceptive as opposed to nondeceptive identifications, incentives, and recommendations.[8]   The proposed interpretation would effectively redraft the statute to insert the phrase "misleading."  That "would constitute a 'serious invasion of'" the province of the Texas Legislature.  *See City of El Cenizo v. Texas*, 890 F.3d 164, 182 (5th Cir. 2018) (quoting *Stevens*, 559 U.S. at 481).

Neither have the defendants advanced any legitimate sweep of the statute as properly construed.  *See Cent. Hudson*, 447 U.S. at 565 & n.8. Although it has been suggested that application of the statute to "inherently deceptive communications" could pass *Central Hudson* muster, the interpretation of this criterion as it has been explained to us is one that our First Amendment case law tells us the Constitution does not permit.  For example, § 1451.153(a)(4) forbids VSP from providing information to

---

[7] The plaintiffs press that this construction is new on appeal.  But this court has at least the discretion to consider such arguments.  "We, for example, would give no mind to a litigant's failure to invoke interpretive canons such as *expressio unius* or constitutional avoidance even if she intentionally left them out of her brief."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 22 (D.C. Cir. 2019), *overruled on other grounds by Garland v. Cargill*, 602 U.S. 406, 410 (2024).

[8] The defendants urge us to consider the concerns about marketplace fairness and patient choice demonstrated in the legislative history.  *See* Tex. Gov't Code § 311.023. We do not think these aims compel a different conclusion.

consumers about discounts and incentives. The defendants say that providing information about which products and services are "more affordable" may be "actually or inherently deceptive." Perhaps on a full hearing the defendants may be able to explain with greater clarity some connection to the permissible regulation of fraud, but at this point the defendants have essentially contested the facial challenge based only on "the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information." *Thompson*, 535 U.S. at 374; *see also Allstate*, 495 F.3d at 166 ("While it may be that a recommended tied body shop does not enjoy as good a reputation for quality work as other body shops, a recommendation to that shop does not involve an inherently false or misleading representation."). Because our case law forecloses us from accepting the defendants' rebuttal on this issue, we conclude that the district court is likely to find that no application of the relevant provisions serves a legitimate state interest.

## B.

We turn now to the plaintiffs' challenge based on associational freedom. The First Amendment protects the right to associate. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). The plaintiffs claim they have been burdened in the exercise of this right. They assert that "VSP is forbidden to 'encourage' or 'persuade' its insureds" to engage in "any association with optometrists." This seems to us to overstate the statute's burdens. *See, e.g.*, *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers*, 485 U.S. 360, 366 (1988).

Even if the statute does turn out to be so burdensome, the plaintiffs have not alleged that the burdened association is protected. The Supreme Court has recognized protection of intimate and expressive association. *See*

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). But the mere fact that it takes two to transact does not mean that every act of commerce falls in those specially protected categories. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 12–14 (1988); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 458–59 (1978). "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

We think the plaintiffs are unlikely to succeed on this basis for their challenge.

## C.

Finally, we address the equal protection claim. "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' But so too, '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citations omitted) (first quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920); and then quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)). The plaintiffs claim their Fourteenth Amendment right to equal protection has been abridged because H.B. 1696 "imposes unique restrictions on vision care insurers and patients," singling them out for differential treatment as compared to "other types of health insurers and patients in Texas."

The plaintiffs argue that this differential treatment should receive intermediate scrutiny. They urge that "equal protection claims involving commercial speech" trigger intermediate scrutiny "[b]ecause regulation of

commercial speech is subject to intermediate scrutiny in a First Amendment challenge." *See Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001).

It is true enough that classifications that disadvantage "suspect class[es]" or burden "fundamental right[s]" receive heightened scrutiny under the Equal Protection Clause. *Plyler*, 457 U.S. at 216–17, 216 n.14, 217 n.15. And when speaker classifications themselves burden First Amendment rights, First Amendment scrutiny can apply. *See, e.g.*, *IMS Health*, 564 U.S. at 571; *Citizens United v. FEC*, 558 U.S. 310, 340–41 (2010); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983).

But not every statute regulating *expression* singles out the *speakers* of the regulated speech as a subgroup. The boundary lines in such a statute may be drawn around a particular activity rather than targeting those engaged in its conduct. For example, a regulation of the sale of tobacco governs "tobacco retailers" in the sense that anyone who wants to sell tobacco must follow the law. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 568–69 (2001) (sustaining regulation of tobacco sales displays without considering disparate treatment of "tobacco retailers" as compared to other retailers); *cf. Ohralik*, 436 U.S. at 460, 468 (sustaining a restriction on solicitation of legal business); *Leathers v. Medlock*, 499 U.S. 439, 452 (1991) ("[A] differential burden on speakers is insufficient by itself to raise First Amendment concerns."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659–61 (1994) (similar).

H.B. 1696 sets standards for the provision of "[a] managed care plan." *See* Tex. Ins. Code § 1451.153(a). We have applied First Amendment scrutiny to the burdens on expression imposed by those standards and think our preceding discussion makes additional analysis on this point unnecessary.

The plaintiffs alternatively argue that the statute fails rational-basis review. They press that the defendants have not presented a sufficient basis for Texas's differential treatment of the healthcare and vision care industries.

But the statute survives rational-basis review if any rational basis for the statute exists, and it is the plaintiffs' burden to show that it does not. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993). The Texas House Insurance Committee received public comment that increasing vertical integration in the vision care industry threatened free competition and patient choice. *See* H. COMM. ON INS., COMPILATION OF PUBLIC COMMENTS, H.B. 1696, 88th Leg., Reg. Sess., at 1 (Tex. Mar. 28, 2023) ("This bill will ensure transparency and choice for patients in the eye care industry which is rapidly consolidating and vertically integrating."). The Legislature could have rationally and nonarbitrarily based the statute on such a ground. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 489 (1955).

We conclude that a claim that the statute classifies and disfavors certain expressive activity is likely to present on the merits the First Amendment issues we have already described, and that there is a likely rational basis for ancillary classifications in the statute that do not target or burden any fundamental rights.

D.

Because we conclude that the plaintiffs are likely to succeed on their commercial speech claim, however, we conclude that the equities balance against the defendants. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Such injury is not, as the defendants put it, "imaginary or wholly speculative," *see Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018) (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006)), given that the

statute, which is to be enforced by the Commissioner, regulates VSP and appears on the record presented likely to constrain its activities.

The balance of hardships and the public interest often "overlap[] considerably" in suits against public officers. *See Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). The defendants assert that the statute promotes competition and informed decision-making, presumably by limiting the information available to consumers. Again, however, our case law counsels against advancing those interests in that way. "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Va. State Bd. of Pharmacy*, 425 U.S. at 770. The equities support the preliminary injunction.

## V.

For the reasons stated above, we AFFIRM the order denying the motion to dismiss as it relates to the Eleventh Amendment immunity of Commissioner Brown, VACATE that order as it relates to the Eleventh Amendment immunity of Governor Abbott and Attorney General Paxton, and REMAND that order so that the district court may dismiss Governor Abbott and Attorney General Paxton for lack of jurisdiction. We AFFIRM the order granting the preliminary injunction as against the Commissioner, VACATE that order insofar as it runs against the Governor and Attorney General, and REMAND the order granting the preliminary injunction so that the district court may modify it to reflect the proper defendants.